Good morning, Your Honors. Elizabeth Barros, Federal Defenders of San Diego, on behalf of Mr. Giron-Soria. There were four issues raised in – and I'd like to reserve about five minutes for rebuttal. There were four – Watch your clock, okay? Thank you. There were four issues raised in Mr. Giron's briefs. I intend to focus on the first two issues, the violation of Mr. Giron's Confrontation Clause rights, and improper vouching which occurred through the introduction of a videotape, as well as the government's questioning of its witnesses and argument to the jury. Each of these errors have one core thing in common. They each, both individually and cumulatively, rendered Mr. Giron's trial fundamentally unfair. The first issue is Mr. Giron's Confrontation Clause rights were violated by the introduction of a videotape containing out-of-court statements by officers, some of whom testified at trial and some of whom did not testify at trial. And in this case, we did ask to sanitize the videotape. On the videotape, Mr. Giron – Mr. Giron repeatedly proclaimed his innocence and asked to confront the woman that was found in the vehicle. The officers then questioned him as to how he knew it was a woman. Mr. Giron explains that he saw a part of her leg after the agents opened up the trunk and heard one of the officers say, it looks like a female. A key issue at trial was how he knew it was a woman. In fact, in closing argument, the government characterized this as Mr. Giron's critical mistake. And that's at ER, the excerpt of records, page 608, volume 3. Now, on the video, Agent Conahee, who was the case agent who sat next to the prosecutor throughout the trial, repeatedly tells Mr. Giron at least ten times, I believe more than ten times, that the other agents involved did not know that the person in the car was a woman and never said that it looked like a female. Agent Conahee says that he knows none of the agents said it was a woman because he spoke with all of the agents that had anything to do with Mr. Giron's case. Now, clearly, he's referring to out-of-court statements by other people and other agents. The government argues that these statements were not admitted for their truth, but to show Mr. Giron's demeanor. Now, that may have been the reason stated by the district court, but that's not what occurred in this case. Kennedy, did the court give an admonition to the jury about that? The court did give an admonition to the jury. However, it's clear that from the beginning, the government intended to argue the statements for their truth, and that's what they did, even after the limiting instruction was given. For example, pre-trial, the government stated, when the defendant lies and the agents know that he has lied, they're confronting him with why they know he has lied, and that is clearly something we should be able to bring up to the jury. That is at ER 101. Now, that wasn't before the jury, was it? That was not before the jury, but I think it was. It was just an argument to the court. It was an argument to the court, but after the limiting instruction was given, the prosecutor, the government in this case, called the agent, or the agent was recalled to the stand the second day of trial. The videotape was basically played at the end of the first day, the limiting instruction was given, and then the jury went home for the evening. The first thing the court, the government did in the morning was ask the agent, was everything on that videotape, is it the truth? Did you lie in any way to the defendant, to Mr. Giron? And the agent says, no. So at that point, the government was clearly arguing the truth of the statements on the videotape. The government then proceeded to argue the truth of the statements on the videotape during closing argument. In the excerpt of record at page 635, volume 3, Mr. Chang said in his closing argument, Agent Conahy, he didn't believe a word that this gentleman was saying, clearly referring again to his statements on the videotape. He then says, he makes one critical mistake, and one critical mistake that is, I submit to you, beaten to hell by Agent Inspector Conahy in that videotape, which is that he, just him knowing the gender of the material witness. That's, again, during the prosecutor's closing argument. He then says, no one knew. He does at that point refer to two agents, Agent Officer Tobin and Officer Conahy, but he doesn't say, Officer Conahy didn't know, Agent Tobin didn't know. He says, no one knew. And it's clear, reviewing the record, that not all the agents that were involved in this case testified at trial. Specifically, Supervisor Booker didn't testify at trial, yet the prosecutor in closing argument suggested that he knew how Supervisor Booker would have testified. As excerpt of record, page 635, volume 3, he refers to an objection that was made by defense to some pictures that came in, and we objected. There were numerous pictures of the gas tank compartment in which the woman was hidden, and he said, well, you heard defense counsel. They objected cumulatively when we put in too many pictures. So what else would Supervisor Booker have said? So it's clear that he was arguing the truth. You know, I'm having trouble following your argument because you're speaking so fast. You've got time. I'm sorry. I'll slow down. So I don't think there's any question here that the government actually argued the statements for the truth of the matter, and after the limiting instruction was given, thereby undermining the efficacy of the limiting instruction that had been given. In any event, the Ninth Circuit has stated in Thomas v. Hubbard that there are some cases where statements are so prejudicial, even if a limiting instruction or curative instruction is given, that they violate the Confrontation Clause. And I think that this is one of those situations. We have an agent repeatedly stating that he knows what those officers said, that those officers testified to, and that this is what those officers would testify to. And he says over and over again, that officer never said that. I know that because I spoke to that office, to all of those officers. Did you indicate that some of the officers did, in fact, testify that he was speaking about? He – there were obviously some officers that the government brought to court, brought to trial. Agent Conahee did testify. He was one of the interrogating agents on the videotape. And Officer Tobin testified, and Officer Velazquez. Velazquez was the primary officer, and Tobin was one of the secondary officers. But importantly, on the tape, during the interrogation, Mr. Giron says, the officer who brought me here to the interrogation room. None of the officers that testified indicated that they brought Mr. Giron to the interrogation room. In fact, Officer Velazquez, the primary agent, said, I lost all contact with the case after I gave them to Officer Tobin. Officer Tobin dealt with him in the outside secondary area, and we don't know who brought him upstairs. Agent Conahee stated the first contact he had with Mr. Giron was upstairs in the interrogation area. In the – on the question of prejudice or whether any of this was harmless error, wasn't the victim – didn't the victim testify – or not the victim, but the illegal alien who was being transported? She did testify, although she was not a credible witness. And by the way, wasn't the substance of her testimony pretty damaging? Well, I don't – I don't think that that's necessarily true. She testified that when she was taken out of the vehicle, she told Agent Conahee that she was unable to recognize Mr. Giron, that she didn't know who he was. And on direct, she basically said, yeah, he looks familiar, which would make sense because they were transported together to the Metropolitan Correctional Center. But she never identified him on direct examination as having been one of the smugglers. It wasn't until there was a break, a 20-minute break in the testimony, and she was outside in the hall speaking with the prosecutor while she was still under oath, and on – that she then, on redirect, identified Mr. Giron as – as being the driver of the vehicle. So I don't believe that her testimony was credible. Moreover, he repeatedly proclaimed his innocence on the videotape. And the interrogation is, I believe, almost an hour long. Throughout the interrogation, even after he's told, you're in a perfect position to help yourself, you know, the next thing we're going to do after we turn off this videotape is take you down to the MCC, the Metropolitan Correctional Center, and you're going to go to court. And he's told his story is ridiculous. He means his innocence. But the jury – the jury heard her testify this, that he was the person, whether it was before or after the break. But they heard that. They didn't know anything about her talking to him. Yes. But she was not – I don't believe she was credible because she had previously told the officers on the day of the arrest, when her memory would have been better, that she could not recognize him and that – and that he basically wasn't the smuggler. So her testimony had changed. But they decide credibility, right? I mean, they can hear conflicting stories and they decide to believe that. Right. I would agree. And I think that leads me to the second error that occurred here, and that's the vouching that occurred through – that occurred at trial, first on the videotape, second during the prosecutor's questioning of the witnesses, and what was emphasized in closing argument. Now, the videotape itself contains numerous instances of vouching and placing the prestige of the government behind the witnesses. Well, vouching usually applies to what goes on in court, doesn't it? Well – By the prosecutor saying those witnesses is credible, I tell you, because I've talked to him. Well, this Court in the United States – I believe it's United States v. Ruddburg has said that vouching can occur in especially powerful form through the testimony of or through statements by an agent. So it's not just through – And also U.S. v. Simtop, a case from this Court as well, says the same thing. So I don't think – it doesn't have to occur through statements by the prosecutor. And here on the tape, there's statements that – by the agents that Mr. Giron is very that his story is ridiculous, that the other agents will go to court and tell the truth, that the agent is going to have all his interview notes and all of his photographs, and that no judge or jury would ever believe Mr. Giron, would ever believe the testimony, would ever believe his statements and his explanation. And the jury heard all of that despite – Well, his story actually is kind of implausible. I mean, I can't – I don't see that as – Well, I think part of the problem is that the Court doesn't have the entire videotape. And I did make a motion to send up the videotape, and that was referred to this panel to determine whether or not the videotape, the entire videotape, should come up. So I think it's basically what we're hearing, and the portion of the videotape that's actually before the Court, because the whole videotape hasn't been sent up, is the portion where the agents characterize his story as unbelievable. So it's not his entire story that's before the Court at this point. Did he testify? He did not testify. But, again, this is the end of the interrogation. And throughout the interrogation, he explains why he was at the border, that he was going to his doctor, who he sees several times a week. There was a witness at trial who – someone from the transportation company for his doctor who confirmed that he picks him up several times a week at the border, had picked him up twice that week. He said he normally crosses the border walking. I won't go through the entire videotape, but I did make a motion to have the Court review that videotape and send it up. We haven't ruled on that motion. It hasn't been ruled on. It may not have been referred to the panel, actually. Sometimes that happens. But I'll look into it. All right. This error – so, basically, we have the agent saying, you're a liar, the agents are going to tell the truth, they're going to go to court and tell the truth, and this is what they're going to say, making personal assurances that the defendant's a liar and that the agents are truthful. Then, in closing, Mr. Chang pointed out, as I mentioned earlier, Agent Conahee, he didn't believe a word that this gentleman was saying, again, referring to the fact that this is a government agent who doesn't believe the defendant, and it was an agent that sat next to the prosecutor at the prosecution table throughout the entire trial. This error was exacerbated when Mr. Chang, when the government stood up after the videotape was played. The videotape had been ordered redacted, and the government actually first played the unredacted version to the jury, and we walked over to the government and said, look, I think this is the unredacted version, and the government stood up and in front of the jury said the wrong videotape's playing to summarize, but it's not the redacted version of the videotape, basically implying that the government had evidence that wasn't being presented to the jury, which – so – which creates – Just to clarify for me, there's a redacted portion of the video. Did you object to the video at all being played at all? Yes. In fact, there were several motions to – the first motion was to suppress the videotape because it hadn't been turned over in discovery. The second motion was to suppress the videotape because it contained all sorts of prejudicial information, in particular 404B. That motion was denied, and the court said, well, I'll have it redacted, and I said, well, if we're going to redact it and not suppress the whole thing, I'd like the opportunity to bring another motion to redact other portions of it and review the videotape, the redacted version. I received that very shortly before next court appearance, and then I moved to redact – to sanitize the videotape and to redact the vouching and the hearsay statements by the officers. Okay. Other instances of vouching – there are two other instances of vouching that occurred when the prosecutor asked the agent if everything he said on the videotape was true, and second, when the prosecutor elicited from the material witness, the woman that was found in the car, Ms. Flores, that she was telling the truth as instructed to do so by the government. And the question posed to the material witness, as I mentioned earlier, came after a break in the testimony, and during that break, the prosecutor was speaking to the material witness out in the hall while she was under oath. Now, in cross-examination, the defense counsel clearly – It went out to the jury, was it not? It was. Defense counsel merely asked the witness if she had spoken with the prosecutor out in the hall during break. And the government says, well, this opened the door to the vouching. And that just can't be the case. In Perry v. Leek, the Supreme Court noted that speaking to a witness while the witness is under oath impedes this truth-seeking process, even if the witness isn't coached during that time period. Furthermore, it shows bias. It shows – it indicates that she was out in the hall speaking to the prosecutor and not the defense. So it shows bias. Was she prosecuted as well? No, she was not. Okay. Did you want to reserve your five minutes? Yes. I will reserve my five minutes. Good morning, Your Honors. My name is Richard Chang. I was government counsel during the trial of Mr. Goron and Saria. Let me first state that this has all been a focus on the omission of the videotape, the videotape of the statement of the defendant himself. Now, this is a situation in which the videotape, quite frankly, was omitted to get in his statement, the defendant's statement, as to what his position was as to how he found himself in a car with a material witness that was secreted in a gas tank compartment. It was never, ever offered for the government to show or to present or admit evidence that otherwise could not have come in. Certainly, interrogations are a, quite frankly, a shock. What was the purpose of it? It was to get the defendant's statement out in front of the jury. Now, I suppose the Court can say, well, you could have done that just through the agent who took the statement and sanitized it that way. But, you know, we're in a position where we're damned if we do and damned if we don't. If we don't present the videotape, they get to argue that we're hiding something, that, in fact, what did they see on the videotape? What did the jury see on the videotape? Essentially, what we said occurred at closing, which was that the interrogator, Inspector Conahay, was beating that issue over and over again, to use possibly the Court's words in another case, badgering that defendant. All right? That's what the jury needed to see. That's what they wanted them to see as well. We never offered up Inspector Conahay's quite assertive interrogation statements to Mr. Guaronsuria as the truth. That's interview findings. Kennedy. HADDAD The closing argument, she said that there was some vouching in the closing argument. Well, I think the position, quite frankly, is that Inspector Conahay was vouching in their argument by his statements. You know, the other witnesses, they're going to come into court and they're going to be telling the truth. And by that very nature, when we presented that videotape with Inspector Conahay saying that in front of the jury, that by itself was vouching. The critical difference there was also they were maintaining the statement that Siler said that was made in closing argument was vouching for the truth. Was it not? No. If the Court is referring to my comment that Inspector Conahay's words were beating the life out of Mr. Guaronsuria's statement, it was about essentially revisiting that subject over and over again about the pant leg, about him knowing whether in fact the material witness was a male or a female. It wasn't saying that, hey, Inspector Conahay knows it and he's telling the truth just because he's the inspector. It was, quite frankly, about revisiting that subject over and over again. You can see the battery. You can see, essentially, how interrogations go. What was important, and even the district court saw it over and over again and gave out that instruction over and over again. You know, there are things that ---- The alleged purpose of the video was to show the demeanor. Absolutely. Well, as far as I can see, the demeanor was never argued. It was never, that never was the purpose accordingly. His demeanor, you'd think if that was the reason for introducing the tape, you'd think that would be something that would be argued in final argument. It's not just using the word demeanor when you argue it. When we argue demeanor, it's about his reaction to what he is being confronted with. The point that Judge had just made is my big stumbling block as well in this case and in your argument because given, you said it was introduced, it was not for the truth. It was for the demeanor and credibility. But really, what you're arguing now is, and what I got from the briefs as well, is you're really arguing the truth of his statements. You're offering it for the truth of his statements, and then you vouched later to say that the prosecutor's statements were also true. No. We certainly offered the videotape for the defendant's statements and the truth of the defendant's statements, making the statements. We never, and in fact, we never argued that the interrogation questions were the truth. In fact, there were instructions specifically over and over again during the time before and even after the videotape was played that that was not being offered for that. But those were just interview techniques. And when at closing argument, when we indicated, when I said Inspector Conahay was beating that subject to death, it was about revisiting that subject. If this Court has seen or will see the videotape, he goes over that issue over and over again. Now, it's, quite frankly, it's important for the jury to make up their decision, right? That's what the entire argument is about. It's incredibly important for the jury to hear the entire statement, the defendant's statement, and his reaction to those statements, and what he said in reaction to those very uncomfortable circumstances that the agents were confronting him with. When you say you're anxious to do this in order to get his statement out, what is it about his statement you want it out? It's an incredible statement and an implausible statement, to use the Court's words. He indicated that he was in line at the pedestrian crossing, indicating, saying that he was going to cross into the United States. When he overhears another person in line talking to yet another person saying, hey, I've got a car, I need to cross it, will you cross it for me? What does he do? He's not part of the conversation. He says in a statement, he pipes up, I'll do it, I'll do it, and in return for that, he expects to get paid $10. He also is saying, under the interrogation in the videotape, that he has been involved in the border area for several years. He knows what the border is about. In fact, he is so knowledgeable about the border that he is suspicious as to what he's going to be driving. So he... Well, you know, one thing that bothers me about it is that if he really thought there were an alien there, would he do that for $10? Well, that's exactly, I suppose, what his statement says. If I thought there was someone there, I wouldn't do it for any money, right? But his response is, you know, he only offered me $10. There couldn't be anything in there, so I took the offer of just $10 as being indicative of nothing being in there, no contraband, no nothing. That's pretty reasonable, isn't it? Well, it's not reasonable because he says he's talking to a person he has never seen before. He is given a car that he has never been associated with before, and he goes to the primary inspection location and identifies himself as being the owner of the car. You know, that's unreasonable. What's also unreasonable, quite frankly, is that when he says he's suspicious, he says he makes a quick examination of the car, right? So even after being offered $10, he's still suspicious. Well, he didn't notice the alternate fuel source when he opens up the hood. He supposedly knows enough about the car to say when the inspectors ask at primary inspection to open up the trunk, well, I can't do it with a key. I have to show you how to do it because it's constructed of wire to hold down the trunk. He has kind of a nervous gait. And then, what does he say about all of this? The defense is that, well, he has arranged for transportation to go to his doctor's appointment. In fact, there was evidence from the doctor's office that he has arranged for transportation in the past, the two days past in that week. Well, if that was the case and he expected to have arranged for transportation that he didn't have to pay for, why is he volunteering to drive a car at the last minute on the pedestrian crosswalk when he's about to enter the United States? And then, finally, let's talk about what he did when he had interaction with a material witness. A material witness, despite what was said before, identifies Mr. Garon-Sarir. She indicated in direct examination that she was introduced to two individuals when she is essentially brought over to the car. She assumed based on the interaction that she indicates was 15 minutes long that two individuals would be driving her. She indicated also that after she got out of the vehicle, after she was identified or seen and located there, she had what? Interaction with this individual. They were transported together. And what does the defendant say to her while they're being transported? Tell them I wasn't the driver or tell them you don't know me. You know, why would a defendant who has no knowledge about the material witness being inside the car he was driving have to say that? You know, the best evidence is not anything that the witnesses or the government agents said. The best evidence on this case against Mr. Sarir is what he says himself about his reasons that we just went through. The fact that he lied at primary inspection, supposedly knowing that he just picked up the car minutes before and then indicating that it was his. And then finally, his interaction with the material witness, saying, hey, don't provide any evidence against me. And in fact, the material witness herself, who identifies after a 15-minute long introduction where they're having interactions before she's placed into this gas tank compartment with the defendant, along with at least one other individual. Now, let's get back to the vouching. And I think she saw him before she got into the room. Yes. That's how she indicated that she had interactions with two individuals that she was introduced to as the drivers. Now, that's why she was clearly under the assumption, even in the direct examination, she thought she was going to be driven by two people. And in fact, one of the people that she was introduced to, she says, was the defendant. And to cement that, and this is the, I think, the critical problem. She was only driven by one person, right? Yes. Absolutely. Only one, and that was the defendant. The defense counsel said she was sort of not too sure about that. Well, I think, well, I don't, I think the record is clear as to how she testified and what she said. She identifies Mr. Garone, Saria. She identifies him as, more importantly, the person who had interactions with her, not only before she was placed in the compartment, but after she was identified and taken out of the compartment as saying those words during transport. And that's a critical matter. And I keep using that word, critical, because, you know, we should focus on what the evidence is, not necessarily what the agent said the evidence is, because that's inappropriate. And that was never what we intended to do when we authored up that videotape. Let's talk about the videotape as well. I admit it was a horrendous mistake that I put in a videotape that didn't have that redacted portion of that Mr. Garone. Did you oppose the motion to submit the videotape? Well, we opposed the motion. The first instance, they indicated that we should not put it in the videotape because they didn't get any time. No, no, no. I mean, before us. The motion that opposing counsel said she filed with us. No. No. I never saw the motion for that. Okay. And so you don't know whether it's the redacted version or the unredacted version that is being offered to this Court? Right. I don't know. I would assume if I were a defense counsel, I would want to have both for the Court so you can see what those were. But I should say there are three versions. The original version that is complete. The second redacted version, which is the one that we played, that redacted out and he mentioned during the examination or interrogation of Mr. Garone. There is one that has the fact that his wife was a family lawyer. Correct. And we never touched anything about the wife. In fact, Judge Bonita has indicated on the record that, you know, the fact that he indicated offhand that we made the remark and offhand that we used by Judge Bonita is that he is married to someone who is undocumented really is not an issue and has no relevance to this particular case. We never touched it as well. Because why? It doesn't make any sense. She could have been undocumented at the time they were married years ago. We're not sure. And more importantly, according to Mr. Garone-Soria, he was coming in from Mexico to seek medical assistance that day. All indications from his own statement in the videotape that he was living outside of the United States and coming in for those regular treatments. So even if his wife is an undocumented alien to the United States, all indications are that he's living possibly with his wife outside of the United States anyway. So that much was irrelevant, never touched by the government at all. So the reason why I go through the number of versions is because every time we have a motion, more things get redacted out. So we were left with essentially the original version, a second version, and then finally, at the very last minute, we ran and excised that portion, maybe as much as two minutes, but no more than that, referencing the wife. Now, that's what they heard, unfortunately, the one that the jury heard about undocumented wife relationship. But again, nothing to do with the case at hand. Let's talk about vouching. You know, Inspector Conahay says, you know, the agents will come into court and they'll tell the truth, right? We never argued about what? Well, the issue, again, that Inspector Conahay was beating the hell out of was that thing about. Identifying her as a female, right? Right. And we put on those witnesses. They take us to task for not putting on every single witness that was there at the time of the finding of the female, of the material witness. We put on the primary inspector. We put on Officer Velazquez. We put on the secondary inspector who had responsibility over the defendant at secondary as well, Officer Tobin. We put on Officer Folks, who was there during the interrogation on videotape. We put on Inspector Conahay, who did the interrogation on videotape. Did he identify which people that he was, which of the agents he was referring to when he said they will testify or that? Not at all. Unfortunately, no reference to names at all within the videotape. Do you know? Yeah, but he took the stand. Oh, yes. I'm sorry. I thought you were talking about on the videotape. Did he identify for the defendant? Yeah. When he took the stand, he identified certainly what his interactions were with the car such that he could notice those individuals that were there. He could not, however, say what other individuals were there that he didn't witness, but he essentially indicated Mr. Tobin was there. Did he say which agents he was talking about when he said to the defendant that these agents will say this and this, and I've talked to them, and that's what they're going to say? Did he ever identify who they were? I don't think specifically in his direct examination indicating who was there. He was only able to say who he believed he spoke to that were there. Here's the problem. They're saying that we should have put on everyone. But he did identify who he said he spoke to? I believe he identified at least Officer Tobin as a person who he had interactions with as secondary because by that time, there was indications that a body had been found, but even at that time, no one knew the gender of that person inside. It was only at the time that Agent Conahay or Inspector Conahay was there and present was that where the two screws unlatched and then the entire lid was taken off. So at that time, the only people that could have said anything were there with Inspector Conahay. And as far as he was concerned when he spoke to Officer Tobin, no one had told anyone, let alone the defendant, anything about the material witness's gender. No. But he specifically said who he talked to and that they had told him these things. And what I'm trying to get at is whether he ever identified who those persons were that he said he talked to and what they would say. I don't think it's no, Judge. I don't think I could ever say that he said that because he indicated who he had met with, he indicated what he saw when he came down, but there was no statement. Okay, I got it. I got it. All right. Now, do we vouch or was it invited? You know, they take us to task because we had interactions with the material witness who's very nervous on the stand. And we, I, outside at the break said, just be calm and tell the truth. You'll be fine. And why is that wrong? It's only wrong if the impression that is left with the jury is that the government somehow coached her. What we had to do when they pointed that out and left that essentially dangling in the wind is to make sure, were you coached? Did we or anyone associated with the government tell you what to say? They did that with Inspector Conahay as well. Look at, and this finally dovetails into the argument, did we offer up Inspector Conahay's interrogation questions for the truth? We have always said no. And look at what they did. They go up there and say, isn't it true, Inspector Conahay, you can lie to people that you interrogate, right? Isn't it true that you can mislead them? And Inspector Conahay recognizes that and says yes. So the, and leaves it at that. The impression ultimately is that Inspector Conahay lied to the defendant, right? You know what? You know what I think? I just, I think you over-tried the case. I think you had a pretty, you have a pretty strong case. And you're, you just went over the top a little bit with the vouching and putting in all the videotape and everything. I don't understand why prosecutors are doing that these days. I think it's probably because we work with juries a lot. And juries turn their decisions on the sometimes very strange things, at least as it relates to us. So we have to put everything that we know up there, including and most importantly the defendant's statement. And that's why we put in the videotape. Isn't it unusual for, during the time of a break, for the person who puts on the witness to then confer with a witness before she takes, before Ms. Boyers takes the stand back? I think if the court, when you're using the word confer, coaching or telling her what to do, it's not unusual. It's not necessarily only unusual. It's not good, especially in front of a jury. But that's not what occurred. If the impression is that Judge Hugg that I did that, that would be incorrect. It was merely to calm her down. This is a civilian witness. This is a woman who is unsophisticated. This is a woman who has tried to get into the United States a number of times. She was very nervous. This wasn't something, hey, you forgot to identify him. Make sure you point to him. That would be bad. And that should be bought out. But that wasn't the case. And that's why the government has to say, hey, did we tell you to do anything? Did we say what to tell you to do? That's not what happened. That's why we did it. Thank you, Your Honor. To quote, I believe it was the Attorney General in the last case, that sounded a lot more like a closing argument than any argument on the legal issues here. And the government stated in Horton v. Mail, the Ninth Circuit said that the harmfulness of certain evidence can be assessed best by taking the prosecutor's word. And at trial, in closing argument, the government said what was critical was not the material witness. He didn't focus on her testimony. But what was critical was Mr. Hedo knowing the gender of the woman who was in the vehicle. And the only reason that would be critical is whether or not you take what the officer said on the videotape to be the truth. Well, doesn't it go to his credibility, though? Because it could also have been offered for the truth. But it could also have been offered for the credibility determination. The videotape? Yes. Well, the videotape was almost an hour long. The jury had plenty of time to listen to his story and to observe his demeanor. It's the last portion of the videotape where he's saying very little and he doesn't change his story that we objected to. It's the portion where it's the agents making all these very prejudicial statements. And, you know, Mr. Cheng indicated that, well, one of the things about demeanor is how you react, what you say in response to the questions. Mr. Hedo didn't change his story. The only person here who changed their story was the material witness. She was the one who on the day of the arrest said, I can't identify him. And at trial she said, oh, yeah, he was the driver from the beginning back at the house. Well, that shows that she changed her story. She is the only one that had changed her story. As the government admitted, she was very nervous on the stand. She had stated on the stand that she hoped to be able to say in the United States as well. And what did the government do during their closing argument with respect to her? You know, Mr. Cheng stated, I'm not Bob Barker. Come on down. I'm a prosecutor. He then said, it occurs to me that oftentimes when I hear rebuttal, it's like a whole different child that they've heard. Letting the jury know that his closing argument was about his personal impression of the evidence. A few minutes later he said, and by the way, I object. I object to this clear insinuation that I put words in anyone's mouth. I submit to you that it's unpalatable because we in fact asked. They didn't. Did they? Well, you had this little covert conversation with each other, didn't you? But what didn't they do? The follow-up. He then says, it should be unpalatable to you and it should be offensive to you. Then turns to me in his closing argument and says, if you're going to make that allegation, bring it on, prove it. And unfortunately, the record here doesn't also, I can't replicate the bodily gestures that accompany that because that's not part of the record. But Mr. Chang, during the government, during closing, was clearly telling the jury, look, this is my impression of the evidence. This, you can believe the witness who had changed her story, who had said she hoped to get a benefit from the government. And so, and who the government admitted was nervous on the stand. And so, this clearly isn't harmless error. The government. Who objected to that closing argument? You know, I'm not sure that we objected at that point in closing argument. There was another point in. If it was improper, you could have objected and had the judge tell the jury not to. That's true. That's true. We could have. We did object to the statement that was posed to the material witness. But I think all these statements in closing argument really just exacerbate the vouching that occurred through the videotape and by his question, the question that was posed to Agent Conahy, and the question that was posed to the material witness herself. Do you have the videotapes with you? I don't. In fact, I do have the order and the, that was sent to me. And it says, it was an order filed March 17th. And it says the appellant's motion for leave to transmit physical evidence is referred for disposition to the panel that considers the merits of the case. The videotape comprising the physical evidence shall be retained in the district court pending the court's decision on the motion. But in any event, I think what happened is there was government exhibits. And so the actual, I have copies of the videotapes in my office. But the marked exhibits are, and the government has possession of those. The government after trial, typically in a southern district, we each take our own exhibits back. But what did you request that we look at? Which, he says there are three versions. Both, the 23A and 23. The motion was to send up both versions that were. Both versions? Yes. And do you have any objection to us looking at the videotape? No. Because I would like to see it. Unless anyone else has an objection. In fact, if you could have it curried or up here, Judge Seiler would be able to see it as well in the next couple days. I could certainly do that with my copies. They're not the marked exhibits. However, those. We have no objections. My assumption is that this Court is indicating both the first version, the redacted second version, and then the third version. I think just the two that the jury saw would be of record. Yes. Those two versions. Thank you. All right. Let's see. Where are we? U.S. v. Hiram Soria is submitted.
judges: Hug, Wardlaw, Siler